AUSAs: Benjamin A. Gianforti, Jackie Delligatti

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | **24 MAG 1722** |
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHARLIE HERNADEZ and<br>SARAH VALERIO PUJOLS,<br><br>                    Defendants. | <u>SEALED COMPLAINT</u><br><br>Violations of 18 U.S.C. §§ 1960, 2, and 371, 31 U.S.C. § 5332, 49 U.S.C. §§ 46314(a) and (b)(2).<br><br>COUNTY OF OFFENSE:<br>BRONX |

SOUTHERN DISTRICT OF NEW YORK, ss.:

　　　　CHRISTOPHER FANT, being duly sworn, deposes and says that he is a Special Agent with the Homeland Security Investigations ("HSI"), and charges as follows:

## COUNT ONE
### (Operation of an Unlicensed Money Transmission Business)

　　　　1.　　From at least in or about 2014 through at least in or about 2019, in the Southern District of New York and elsewhere, CHARLIE HERNANDEZ, the defendant, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce and (i) was operated without an appropriate money transmitting license in a State where such operation was punishable as a misdemeanor or a felony under State law; (ii) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section; and (iii) otherwise involved the transportation and transmission of funds that were known to the defendant to have been derived from a criminal offense and to be intended to be used to promote and support unlawful activity, to wit, HERNANDEZ conducted, controlled, managed, supervised, directed, and owned all or part of an unlicensed money transmission business that transferred funds on behalf of the public, without meeting the Federal or State registration requirements set forth for money transmitting businesses by smuggling bulk currency from New York City to the Dominican Republic in exchange for a fee that he knew was derived from a criminal offense and was intended to be used to promote and support unlawful activity.

(Title 18, United States Code, Sections 1960 & 2.)

## COUNT TWO
### (Operation of an Unlicensed Money Transmission Business)

　　　　2.　　From at least in or about 2014 through at least in or about 2019, in the Southern District of New York and elsewhere, SARAH VALERIO PUJOLS, the defendant, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce and (i) was operated

without an appropriate money transmitting license in a State where such operation was punishable as a misdemeanor or a felony under State law; (ii) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section; and (iii) otherwise involved the transportation and transmission of funds that were known to the defendant to have been derived from a criminal offense and to be intended to be used to promote and support unlawful activity, to wit, PUJOLS conducted, controlled, managed, supervised, directed, and owned all or part of an unlicensed money transmission business that transferred funds on behalf of the public, without meeting the Federal or State registration requirements set forth for money transmitting businesses by smuggling bulk currency from New York City to the Dominican Republic in exchange for a fee that she knew was derived from a criminal offense and was intended to be used to promote and support unlawful activity.

(Title 18, United States Code, Sections 1960 & 2.)

## COUNT THREE
### (Conspiracy to Operate an Unlicensed Money Transmitting Business)

3. From at least in or about 2014 through at least in or about 2019, in the Southern District of New York and elsewhere, CHARLIE HERNANDEZ and SARAH VALERIO PUJOLS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, operation of an unlicensed money transmitting service, in violation of Title 18, United State Code, Section 1960.

4. It was a part and an object of the conspiracy that CHARLIE HERNANDEZ and SARAH VALERIO PUJOLS, the defendants, and others known and unknown, knowingly would and did conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, which (i) operated without an appropriate money transmitting license in New York, where such operation is punishable as a misdemeanor or felony under State law; (ii) failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder; and (iii) otherwise involved the transportation and transmission of funds that were known to the defendants to have been derived from a criminal offense and to be intended to be used to promote and support unlawful activity.

Overt Acts

5. In furtherance of the conspiracy, and to effect the illegal objects thereof, CHARLIE HERNANDEZ and SARAH VALERIO PUJOLS, the defendants, committed the following overt acts, in the Southern District of New York and elsewhere:

a. On or about December 20, 2019, a cooperating witness ("CW-1") met with HERNANDEZ in the Bronx. During the meeting, CW-1 provided HERNANDEZ with approximately $121,215 in proceeds derived from narcotics trafficking. The same day,

HERNANDEZ gave approximately $61,215 to PUJOLS for the purpose of transporting it to the Dominican Republic and kept $60,000 to transport to the Dominican Republic himself.

(Title 18, United States Code, Section 371)

## COUNT FOUR
### (Bulk Cash Smuggling)

6.    In or about December 2019, in the Southern District of New York and elsewhere, SARAH VALERIO PUJOLS, the defendant, with the intent to evade a currency reporting requirement under 31 U.S.C. § 5316, knowingly concealed more than $10,000 in currency and other monetary instruments on her person and in any conveyance, article of luggage, merchandise, and other container, and transported and transferred and attempted to transport and transfer such currency and monetary instruments from a place within the United States to a place outside of the United States, and from a place outside the United States to a place within the United States.

(Title 31, United States Code, Sections 5332 & 2.)

## COUNT FIVE
### (Entering an Airport or Aircraft Area in Violation of Security Requirements)

7.    From at least in or about 2014 through at least in or about 2019, in the Southern District of New York and elsewhere, CHARLIE HERNANDEZ, the defendant, did knowingly and willfully enter an aircraft or an airport area that serviced an air carrier or foreign air carrier, in violation of security requirements proscribed under Title 49, United States Code, Section 44901, 44903(b) and (c), with the intent to evade security procedures and restrictions and with the intent to commit, in the aircraft and airport area, a felony under the law of the United States and a State, namely, operation of an unlicensed money transmission business, in violation of Title 18, United States Code, Section 1960, to wit, HERNANDEZ entered the secure passenger area at John F. Kennedy International Airport ("JFK") with the intent to evade security procedures and restrictions in order to smuggle bulk currency he knew was derived from a criminal offense with the intent to operate an unlicensed money transmission business, in violation of 18 U.S.C. § 1960.

(Title 49, United States Code, Sections 46314(a) and (b)(2).)

## COUNT SIX
### (Entering an Airport or Aircraft Area in Violation of Security Requirements)

8.    From at least in or about 2014 through at least in or about 2019, in the Southern District of New York and elsewhere, SARAH VALERIO PUJOLS, the defendant, did knowingly and willfully enter an aircraft or an airport area that serviced an air carrier or foreign air carrier, in violation of security requirements proscribed under Title 49, United States Code, Section 44901, 44903(b) and (c), with the intent to evade security procedures and restrictions and with the intent to commit, in the aircraft and airport area, a felony under the law of the United States and a State, namely, operation of an unlicensed money transmission business, in violation of Title 18, United States Code, Section 1960, to wit, PUJOLS entered the secure passenger area at JFK with the intent to evade security procedures and restrictions in order to smuggle bulk currency she knew was

derived from a criminal offense with the intent to operate an unlicensed money transmission business, in violation of 18 U.S.C. § 1960.

(Title 49, United States Code, Sections 46314(a) and (b)(2).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9. I have been a Special Agent with HSI for approximately six years. During that time, I have participated in numerous investigations of unlawful narcotics distribution and associated money laundering, as well as bulk cash smuggling in violation of Title 31, United States Code, Section 5332. During the course of those investigations, I have conducted or participated in surveillance, narcotics and money transactions with undercover officers and confidential witnesses, the execution of search warrants, debriefings of witnesses, and reviews of taped conversations and other records relating to narcotics transactions. Through my training, education, and experience, I have become familiar with the manner in which illegal narcotics are imported and distributed; the way in which illegal narcotics are prepared, packaged, and sold on the street; some of the methods of payment for such narcotics; and some of the methods that are used to disguise the source and nature of the profits made by narcotics dealers.

10. I make this Affidavit in part on personal knowledge based on my participation in the investigation and conversations with other HSI Special Agents and Task Force Officers, and other law enforcement officers; conversations with two cooperating witnesses (CW-1 and "CW-2")[1]; reviews of reports and other documents prepared by agents and others; and physical surveillance.

11. Throughout this Affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made unless I specifically so state. Rather, information about the statement was provided by the specified law-enforcement officer or another individual to whom I have spoken or whose reports I have read and reviewed. In addition, unless otherwise noted, the conversations from which the statements referenced herein were sourced were conducted principally in Spanish and later translated into English. All statements referenced herein

---

[1] CW-1 has been cooperating with law enforcement since CW-1's arrest in or about October 2021 on money laundering, bulk cash smuggling, and narcotics distribution charges, in the hopes of ultimately receiving leniency when CW-1 is sentenced for CW-1's crimes. The information CW-1 has provided to law enforcement has proven credible and has been corroborated by other evidence, including, among other things, CW-1 and CW-2's communications with the defendants and recordings CW-1 and CW-2 have made of meetings with the defendants.

CW-2 has been cooperating with law enforcement since being charged with money laundering, bulk cash smuggling, and narcotics distribution charges along with CW-1 in or about October 2021. Because CW-2 resides in the Dominican Republic, and was there at the time CW-1 and CW-2 were charged, CW-2 has not been arrested on these charges. Nonetheless, CW-2 is cooperating with law enforcement in the hopes of receiving leniency when CW-2 is ultimately sentenced for CW-2's crimes. The information CW-2 has provided to law enforcement has proven credible and has been corroborated by other evidence, including, among other things, CW-1 and CW-2's communications with the defendants and recordings CW-1 and CW-2 have made of meetings with the defendants.

are among many statements made by others and they are set forth in substance and in part, unless otherwise indicated. Similarly, the information in this Affidavit resulting from surveillance, except where otherwise specifically indicated, does not set forth my personal observations, but rather was provided to me by other law-enforcement officers who observed the events described, and/or to whom I have spoken or whose reports I have read.

12.     Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this Application. I have not attempted to set forth the complete factual history of this investigation or all of its details. In making this Application, I rely only on the facts stated herein.

## Background to the Investigation

13.     Since approximately December 2018, HSI and the New York City Police Department ("NYPD") have been investigating an international narcotics trafficking and money laundering organization involved in, among other things, trafficking fentanyl in the United States and moving the proceeds of narcotics trafficking from the United States to the Dominican Republic, including by using flight attendants at major airlines to smuggle bulk quantities of cash. Law enforcement officers have been conducting this investigation with the assistance of CW-1 and CW-2. CW-1 was a member of this money laundering organization and has used a number of different flight attendants to smuggle bulk cash to the Dominican Republic, including CHARLIE HERNANDEZ and SARAH VALERIO PJUOLS, the defendants. CW-2 was also a member of this money laundering organization and has assisted CW-1 with the transport of bulk cash from the United States to the Dominican Republic.

*Background on the Known Crewmember (KCM) Program*

14.     From my training and experience, including my participation in this investigation and my discussions with other law enforcement officers, I have learned, among other things, that international narcotics traffickers who traffick narcotics in the United States often accumulate significant cash proceeds that need to be moved outside of the United States. In particular, I have learned that narcotics traffickers who operate from the Dominican Republic often prefer to receive the proceeds from their illegal activity in the United States in cash, rather than relying on banking services. This requires the smuggling of large quantities of cash from the United States to the Dominican Republic. One common tactic for smuggling cash to the Dominican Republic involves paying flight attendants who work routes between U.S. cities and the Dominican Republic to move large quantities of cash. I have learned the following about this scheme:

a. Flight attendants are ideal for smuggling bulk cash because they generally have "Known Crewmember" ("KCM") status with the Transportation Security Administration ("TSA"), which allows airline employees to pass through airport security more quickly via a dedicated KCM lane that typically entails less scrutiny. JFK, from which all the flights relevant to this complaint were taken, has a KCM lane.

b. Unlike the security screening process for ordinary passengers, which requires that passengers place their belongings through an x-ray machine, the KCM lane does not automatically require airline employees to place their belongings through an x-ray machine. Once an individual goes through security—whether the ordinary security screen process or the KCM lane—that

5

individual enters the "sterile," area, from which it is possible to access airplanes and other secure areas of the airport.

c. KCM privileges are available to airline employees such as flight attendants whose airline participates in the KCM program. Airline employees must present valid identification each time they wish to use the KCM lane. Individuals with KCM privileges are permitted to bring personal property through the KCM lane so long as the property is not on TSA's prohibited items list. This applies to personal property. Those with KCM privileges may not bring property belonging to other individuals through the KCM lane.

d. Individuals who gain KCM privileges through their employing airline may use the KCM lane only for (1) business travel related to their employing airline, and (2) domestic personal travel. Such individuals are not required to wear their crewmember uniform to use the KCM lane. However, those who are in uniform receive certain privileges not afforded to those who are not in uniform.

e. If an airline employee attempts to use the KCM lane and the TSA employee monitoring the KCM lane has any concerns about that employee's security status, he or she may take follow-up steps, including referring the airline employee to the ordinary screening process.

f. In effect, given these loosened security procedures, KCM privileges allow flight attendants to bypass airport security with large quantities of cash without that cash being seized.

*Background on the Registration of Money Transmitting Businesses*

15. From my training and experience, including my participation in this investigation and my discussions with other law enforcement officers, I have learned, among other things, the following:

a. New York law requires anyone operating a money transmitting business to be licensed. In particular New York State Banking Law Section 641(1) provides in pertinent part that "[n]o person shall…engage in the business of receiving money for transmission or transmitting the same, without a license therefor obtained from the superintendent as provided in this article, nor shall any person engage in such business as an agent, except as an agent of a licensee or as agent of a payee."

b. Under federal law, money transmitting businesses must also be registered with the U.S. Department of Treasury. For instance, Title 31, United States Code, Section 5330(a)(1) provides that "[a]ny person who owns or controls a money transmitting business shall register (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury." Section 5330(d)(1), in turn, explains, in part, that the "term 'money transmitting business' means…(A) any…person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional

financial institutions system; (B) is required to file reports under section 5313; and (C) is not a depository institution (as defined in section 5313(g))."[2]

        c.    The New York and federal requirements for money transmitting businesses apply to formal and informal arrangements alike.

    16.    Based on my review of records from New York State and FinCEN, I know that neither CHARLIE HERNANDEZ, nor SARAH VALERIO PUJOLS, has ever held a New York State or federal money transmission license.

### HERNANDEZ and PUJOLS's Participation in the Smuggling of Narcotics Proceeds

    17.    Based on my discussions with other law enforcement officers participating in this investigation and CW-1, and my review of reports drafted by other members of law enforcement, recordings, and other records, I have learned, among other things, the following:

        b.    CHARLIE HERNANDEZ, the defendant, has worked as a flight attendant since at least in or about 2007, including for a certain international airline (the "International Airline"). In or about 2014 or 2015, CW-1 began using HERNANDEZ to smuggle narcotics proceeds from New York City to the Dominican Republic. CW-1 estimates that HERNANDEZ smuggled at least approximately $2,500,000 in narcotics proceeds from the United States to the Dominican Republic at CW-1's direction between in or about 2014 and in or about 2019 in exchange for a fee—generally, a low percentage of the amount of cash HERNANDEZ smuggled on CW-1's behalf. Over the course of their relationship, CW-1 told HERNANDEZ on multiple occasions that the cash HERNANDEZ was smuggling to the Dominican Republic was derived from narcotics trafficking. On at least one occasion, CW-1 and HERNANDEZ attended a party in the Dominican Republic where CW-1 introduced HERNANDEZ to a narcotics dealer who was one of CW-1's money laundering clients.

---

[2] The Secretary of the Treasury has the authority to establish which individuals and entities are subject to 31 U.S.C. 5330's registration requirement. 31 U.S.C. §§ 5313(a); 5330(a)(2) & (c)(1). These regulations are contained in the Code of Federal Regulations ("CFR"). In particular, 31 C.F.R. § 1022.380(a)(1) provides that "each money services business (whether or not licensed as a money services business by any State) must register with FinCEN …as required by 31 U.S.C. 5330[.]" 31 C.F.R. § 1010.100(ff) includes a "money transmitter" as a "money services business." The term "money transmitter" is, in turn, defined to include "a person that provides money transmission services." The term "money transmission services" is defined as "the acceptance of currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." *Id*. "Any means" is defined as including, but not limited to, "through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system." *Id*. Moreover, "money transmitter" is defined as "[a]ny other person engaged in the transfer of funds." *Id*. Accordingly, the Treasury regulations establish that any person engaged in the transfer of funds is required to register with FinCEN.

       c. SARAH VALERIO PUJOLS, the defendant, has worked as a flight attendant since at least in or about 2009 or 2010, including for the International Airline. In or about 2014 or 2015, CW-1 began using PUJOLS to smuggle narcotics proceeds from New York City to the Dominican Republic, and PUJOLS continued to smuggle narcotics proceeds for CW-1 until as recently as in or about 2019. CW-1 estimates that PUJOLS smuggled at least approximately $1,500,000 in narcotics proceeds from the United States to the Dominican Republic at CW-1's direction between in or about 2014 and in or about 2019 in exchange for a fee—generally, a low percentage of the amount of cash PUJOLS smuggled on CW-1's behalf. PUJOLS was aware that the money was from narcotics trafficking because CW-1 would often refer to picking up money from "los tigres," which, based on my training and experience, as well as my discussions with CW-1, I understand to be a Spanish slang term for narcotics dealers.

       d. HERNANDEZ and PUJOLS were aware that they both were smuggling narcotics proceeds for CW-1. CW-1 would often refer to giving bulk currency to PUJOLS when CW-1 was with HERNANDEZ and vice versa.

       e. In or about December 2019, both HERNANDEZ and PUJOLS were employed as flight attendants with the International Airline. On or about December 20, 2019, CW-1 met with HERNANDEZ in the Bronx. During the meeting, CW-1 provided HERNANDEZ with approximately $121,215 in proceeds derived from narcotics trafficking. The same day, HERNANDEZ gave approximately $61,215 to PUJOLS for the purpose of transporting it to the Dominican Republic and kept $60,000 to transport to the Dominican Republic himself.

       f. Later that day, before boarding an International Airline flight from JFK to the Dominican Republic, PUJOLS was stopped by agents with Customs and Border Protection ("CBP"). The CBP agents explained to PUJOLS the restrictions on transporting United States currency internationally under Title 31 of the United States Code and asked her to report any United States currency she intended to bring out of the country. PUJOLS orally reported her possession of approximately $1,000 and filled out a CBP form making the same affirmation. PUJOLS also produced approximately $1,215 from her wallet for the CBP agents' inspection. Upon further inspection, however, the CBP agents found approximately $60,000 in United States currency in three bundles concealed in PUJOLS's purse, which they seized. After PUJOLS was stopped by CBP, HERNANDEZ contacted CW-1 to tell CW-1 about the stop and the seizure. HERNANDEZ did not deliver the remaining approximately $60,000 that CW-1 gave him. CW-1 does not know what HERNANDEZ did with the cash.

g. Following the incident described above, PUJOLS was terminated by the International Airline.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of CHARLIE HERNANDEZ and SARAH VALERIO PUJOLS, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

/s Christopher Fant  (By Court with Authorization)
Christopher Fant
Special Agent
HSI

Sworn to me through the transmission of this Complaint by reliable electronic means (Telephone), this 30th day of April, 2024.

_____
THE HONORABLE SARAH L. CAVE
United States Magistrate Judge
Southern District of New York